## THOMSON–HOUSTON ELECTRIC CO. v. TRACTION EQUIPMENT CO.

### GENERAL ELECTRIC CO. v. SAME.

#### (Circuit Court, E. D. New York. July 31, 1908.)

1. PATENTS (§ 328*)—INFRINGEMENT—RHEOSTATS FOR ELECTRIC CARS.

The Wightman patent, No. 411,947, for a rheostat for use on electric railway cars, was not anticipated, and discloses patentable invention, but is not of such broad scope as to cover the use of any material in any form in the construction of a resistance pile, and is not infringed by the structure of the Lundie patent, No. 687,569, in which cast-iron plates or grids are used in contact only by means of hubs thereon.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

2. PATENTS (§ 328*)—INFRINGEMENT—RHEOSTATS FOR ELECTRIC CARS.

The Short patent, No. 459,794, for a rheostat for use on electric railway cars, discloses patentable invention in the manner of construction of the pile and the idea of making flues through the same by so fastening the sheets together as to cause perforations through the same to register, but not in the manner of fastening them by the use of nonconducting pencils or insulated bolts, and is not infringed by the device of the Lundie patent, in which air spaces for cooling purposes are provided between the plates.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. On final hearing.

Betts, Sheffield & Betts (L. F. H. Betts, of counsel), for complainant.

Collin, Wells & Hughes (George H. Gilman and Thomas Ewing, Jr., of counsel), for defendant.

CHATFIELD, District Judge.   The above actions are based upon alleged infringements of patents.   The two cases arise from the use by the defendant in both cases of the same device, and have been tried and argued together, although the record has been separately completed, and neither case is dependent upon the other.   But for apparent reasons the cases will be treated together in this decision, and duplication can be thus avoided.

The device, the use of which is involved in the actions, is called in the various patents, and by most of the witnesses, a rheostat.   The definitions given by the experts will be referred to subsequently; but in order to form a basis for the legal questions involved, and in order to avoid purely mechanical terms, a general statement, from the standpoint of an individual other than an electrical engineer, may be useful. The adaptation of electricity as a power for propelling street cars by means of motors, receiving the electrical current from a feed or supply wire, and, in fact, experiments, even, upon any plan useful for practical application, are a matter of recent development.

According to the testimony in this case, the first electric street car in the United States, operating by means of a motor, was run by one

E. M. Bentley, at the works of the Brush Electric Company, Cleveland, Ohio, and upon a mile of track in that city, during the years 1883 and 1884. The experiments at Cleveland continued through the year 1885, and in 1887 the Thomson-Houston Company entered into the electric railway business. In 1889 this company purchased an interest in the Bentley-Knight Company, which had been following up the inventions of Mr. Bentley, in 1883, and as a result of the experiments of the Thomson-Houston Company the Wightman patent, No. 411,947, on which the first of these suits is based, was obtained. The precise date of the Wightman patent is October 1, 1889, upon an application filed July 5, 1889, and in general the Wightman patent was for a rheostat or electrical resistances to be used in situations "where a bulky and cumbersome apparatus could not be readily employed—as, for instance, under electric street cars." In the ten years between 1890 and 1900, rapid and widespread advance was made both in the construction and in the operation of street railways with cars run by electric motors, in the form generally known as "trolley cars."

The Short patent, upon which is based the second suit, was granted upon the 22d day of September, 1891, upon an application filed March 17, 1891, and is stated to relate to "adjustable rheostats or rheostatic-current regulators used on electrically-propelled cars or vehicles." The Case patent was of much later date, having been granted on November 18, 1902, upon an application filed May 10, 1901, and the Case invention is stated to relate "to improvements upon the generic type of resistance device shown in the patent to Short, No. 459,794." The invention is stated to consist in a "construction and arrangement whereby the rheostat is made light, adapted to be readily cooled, and to be mounted in a simple manner on the lower side of the floor of a railway car."

It may here be said that the defendant has acquired rights in another patent for rheostats, under date of November 26, 1901, No. 687,569, upon an application filed August 15, 1901, by John Lundie, and in this patent the invention is stated to relate "to rheostats for use in regulating the amount of current flowing through an electric circuit in which it is interposed, designed more especially for use in connection with electric motors used in traction systems."

The present actions were begun in 1903, and the record shows that the complainant in the first case, the Thomson-Houston Electric Company, has acquired the rights to the Wightman patent, and the complainant in the second action, the General Electric Company, has acquired the rights to the Short and Case patents, while the defendant, the Traction Equipment Company, as has been said, holds by assignment the rights under the Lundie patent. The complainant in each action has in general alleged infringement. The defendant has set up numerous defenses; but, before considering these separately, it is necessary to consider for a moment the general purpose and use of rheostats, so called, and the methods by which the object of their use has been accomplished in the various electric trolley lines. A point has now been reached where a comparatively similar style of rheostat seems to have been placed upon the market by most of the companies manufacturing them for this purpose.

In general, it is commonly understood that each trolley car, when operated by itself, receives an electric current from the feed or supply wire, which is transmitted through the electric motor, and there transformed in such a manner as to operate some form of gear by which the wheels of the car are driven. The voltage or intensity of the electric current at the supply or feed wire is constant, and the quantity of current, or the amount of current expressed in amperes, is also constant so far as each car is concerned. The current is let in to the motor by means of a controller or switch, and the various forms of controllers have been the basis of considerable litigation previously in the United States courts, during the course of which the use of rheostats has been defined and considered.

Assuming that the potential (or the voltage) and amperage of the electric current at the supply wire are constant, and that upon connection with the ground the current is dissipated or scattered at what may be called "zero potential," and assuming that there is current sufficient throughout the supply wire to give to each trolley car a constant current when in connection with the ground or return rail, it will be seen that a certain amount of electricity will pass through the trolley pole of each car, and through the motor of that car whenever connection is made by means of a switch or controller. If this electric current in each car is turned on to the electric motor suddenly, before the motor can fully assume its work and thus neutralize the strength of the current by the work done, a large amount of electrical energy must be transformed into heat by the resistance of the metal of the motor itself, and the effect of this would be disastrous upon the motor. Various devices have been used, intended to accomplish the result of relieving this defect, by way of absorbing or using up the energy of the current supplied through the trolley pole or contact shoe, and to give a gradual and relatively proportionate increase of current to the motor, until the motor of the car equalizes in work done the strength of the current. In the absence of some such device, the transformation of the current inside of the motor into heat, rather than the utilization of this heat in work, would destroy or render useless the motor itself.

The complainant's expert, Mr. Bentley, has defined this in the following way:

"I should state that a rheostat is a device designed to be interposed in an electric circuit to present a resistance to the flow of current therein. A rheostat accomplishes its function of diminishing or adjusting the current flowing in the circuit only at the expense of electrical energy, which is dissipated and wasted in the form of heat within the rheostat, instead of performing some normally useful purpose, such as the production of electric light or power, by the conversion of the electrical energy into light or into mechanical motion. The construction of a rheostat capable of practical service in circuits carrying heavy currents under high pressure—as, for example, an electric railway circuit—is a more or less difficult matter, in view of the large amount of heat which must be produced by the device and properly disposed of without injury thereto."

The defendant's expert says that rheostats are—"used to control a current by the resistance which they offer to its passage. The greater this resistance the less will be the strength of the current, with a

given electro-motive force or pressure. The resistance offered by a conductor is directly proportional to its length, inversely proportional to its cross-section, and depends also upon the nature of the material"—iron having considerably greater resistance than copper.

Having thus generally considered the purpose and use of a rheostat, let us consider briefly the three forms of this resistance exemplified by the Wightman, Short (and Case), and Lundie patents, before discussing other patents or the prior art.

The scope of the Wightman patent is stated in the claims of the patent to be:

"1. An electric-resistance pile consisting of alternate layers of conducting and insulating material, having the parts of each conducting-strip to either side of its center connected, respectively, to the two adjoining conducting-strips."

"5. An electric-resistance pile consisting of alternate sheets of mica and a conducting material, with the successive sheets of the conducting material in electrical contact."

"7. An electric-resistance pile consisting of alternate sheets or layers of mica and iron, having the successive sheets of iron in electrical connection."

The principle of this rheostat seems to have been to construct a compact pile or series of metallic plates occupying a small space, and by means of many sheets of insulating material, and by the use of slits or slots in each sheet of the conducting material, to compel the current to pursue an exceedingly long and zigzag path from one pole of this compact pile to the other. Bearing in mind that the object of the rheostat is to offer resistance by turning the electrical current into heat, it can immediately be seen that a large number of these compact piles, mounted side by side as Wightman planned, in a trough lined with insulating material, and with no conducting or cooling device, would but slowly and imperfectly accomplish the object of transforming a strong current of electricity into heat, dissipating this heat, and being ready to receive another current after a very short interval. The familiar illustration furnished by a motorman turning his controller back and forth, when a trolley car is proceeding slowly, with the brake on, thus sending the current through the motor and the resistance or rheostat many times a minute, is all that is necessary to point out the difficulties with which a rheostat constructed according to the Wightman patent would have to contend.

The Short patent attempted to remedy this defect by means of flues or air ducts through the resistance and the interposition of heat-conducting plates, of some material such as copper, projecting beyond the resistance plates, and thus affording radiation, together with a method of binding the pile or series of plates together, through pencils of some insulating material, such as slate, to be held by clamps or bolts at the ends of these pencils. The idea in the Short patent was to take away the box or trough in which Wightman packed his series, and to furnish some means by which the series could be attached to a street car and at the same time give as much opportunity as possible to the currents of air produced by the motion of the street car to act in a cooling manner upon the plates. The claims in the Short patent to which particular attention must be given are as follows:

"4. A resistance comprising an assemblage of plates strung on nonconducting pencils and clamped between heads or end plates, substantially as described."

"5. A rheostatic element comprising clamping-heads, clamping-bolts for the same, nonconducting pencils between said heads, and resistance-plates and insulating-plates strung on the pencils and clamped between the heads, substantially as described."

The Case patent was an advance in a similar construction, by which Mr. Case separated the greater part of the surface of the conducting elements in the Short patent from each other, thus leaving air spaces between these elements entirely without any insulating material, except at what are called in the patent the "supporting hubs," through which the insulating supporting rods passed.

Upon the trial of the action testimony was offered to show use in the years 1897 to 1899, by the Crocker-Wheeler Company, of Trenton, N. J., of an idea with reference to cast-iron plates or grids equipped with hubs, as the elements of resistance for various purposes in electrical work, the idea of which, as the testimony showed, had been obtained from the Sprague Elevator Company, and that Mr. Sprague, of this company, had used a cast-iron grid, fitted with a hub of the form in question, before the year 1896. This clearly antedated the Case patent, and although Sprague had never taken advantage of his idea, in the way of obtaining a patent, it became apparent that the patent issued to Case was invalidated by this prior use, and claim of infringement of the Case patent was therefore withdrawn.

The Lundie patent, of a date only a few days later than the Case patent, makes use as well of a cast-iron grid with a hub, and with insulating washers between alternating pairs of hubs, while metallic washers are used at the opposite ends of the grids, thus forming a cumulative magnetic field, much similar in general plan to the resistance field in the Case patent, so far as the arrangement of the path of the current, the contact through hubs, and the separation of the elements or grids (which Lundie calls "resistance units," and which Case calls "resistance grids") are concerned. In each of these patents the hubs are perforated, and an insulated rod passes through the different openings and holds the various units within the box or frame by a nut and thread, and every part of each insulated grid or each resistance unit is separated by an air space, except at the faces of the hubs, which bear a relatively small proportion to the flat lateral surfaces of the grid.

The greatest point of dissimilarity between the Lundie and the Case patent is that in the Lundie patent the resistance unit is in the form of a double spiral, with a hub at the center of each spiral, and with a third hub between these spirals; insulation being so inserted in the form of washers as to make this third hub purely a means of support and not of contact. In the Case patent the resistance grid consists of a plate in the form of a combination of successive letters "u," with a hub at the beginning, a second hub at the grid, and a third hub in the center; this third hub again being insulated and used merely for the purposes of support, and all three hubs in a line upon the same side of the box or frame within which the grids are bolted. The following diagrams will show sufficiently accurately the shape of these grids and sheets:

Fig. 6.

WIGHTMAN

FIG. VI.

SHORT

LUNDIE

Fig. 2.

CASE

The construction in use by the defendant at the time of the bringing of this suit, and as to which infringement is claimed, leaves out the third or center hub of the Lundie patent, thus leaving out as well one set of insulating washers and one insulated rod.

In the Case patent the grids are stated to be composed "preferably of cast iron," while in the Lundie patent the spiral is stated to be intended to include "any form of wire or strip winding from the inside to the outside after the manner of a spiral"; but in actual use by the defendant the grids are also made of cast iron. In the Wightman and Short patents, the elements are stated to be "of iron," and are called "sheets," while it appears from the testimony that in the early experiments of Mr. Bentley cast-iron plates were fastened together in lateral contact in a compact mass, in such a way that the current passed through the mass from face to face of these plates; the resistance being increased and principally effected by the oxidization of the plates. In the Wightman, Short, Case, and Lundie patents the current follows from end to end, in the longest lineal direction, the successive lengths of the plates or grids, and thus makes use of an exactly contrary principle to that of the Bentley experiments, although the electrical resistance of the substance is in all of these rheostats (as in every device used for the purpose) the means of making use of or transforming the electrical current into heat.

The complainant contends that this idea or principle of an elongated path and of a large resistance, which is claimed to be in direct proportion to the length of the path, was novel and of itself an invention. The complainant also contends that when Wightman specified the use of iron in claim 7 of his patent as the material of which his elements were to be composed in one form of the structure covered by his invention, he thereby included all forms of iron whether wrought or cast. The defendant, on the other hand, contends that Wightman's patent, in its various claims referring to sheets, could not have contemplated plates or rods of greater thickness than would be capable of use in a compact pile with interlocking surfaces, and that, therefore, Wightman could not have had in mind nor anticipated the use of cast iron.

Mr. Bentley, the complainant's expert, has submitted a sketch to illustrate his theory that a cast-iron plate with a bend or shoulder near the extremity, by which the plates would be brought in contact on either side of the sheet of insulating material, would fulfill the conditions of the Wightman patent, and would show that under Wightman's claims cast-iron plates, as well as wrought-iron sheets, were covered and included. To disprove this theory the defendant relies not only upon the definition of the word "sheet" as distinguished from the definition of the word "plate" in dictionaries and text-books, but also refers to certain patents which illustrate the growth of the electrical art prior to the time of the Wightman patent, and has furnished the testimony of witnesses to fix the date at which cast iron was stated by those experimenting to have some seven or eight times the resistance of wrought iron. This date is fixed by these witnesses as 1895-96, some years subsequent to the Wightman patent. Short in his patent uses the word "plate," and there is nothing in the patent from which it can be determined that Mr. Short had in mind merely the

limited use of a thin sheet, although he describes his resistance as composed of plates "of, say, wrought iron"; and, on the contrary, there is nothing in the Short patent from which it can be inferred that at that time Mr. Short knew of or had experimented with the difference in resistance between wrought and cast iron.

The complainant also contends that the method specified by Short, and shown in his patent, of supporting the various plates by means of insulated pencils or pencils of nonconducting material, passing through the openings or perforations in the elements, and fastened with some bolting or clamping construction to the box or frame, which is substituted in the Short patent for the trough of the Wightman patent, is of itself an invention which is infringed by the use of the defendant's insulated rods for a similar purpose. The defendant alleges that the use of rods in this manner was not invention, but was an old and well-known mechanical device, used in many ways, and upon all kinds of structures, and that the idea of Short was to prevent the movement of the resistance elements laterally by insulating nonconducting rods through the perforations, and that the binding together of the elements, and the keeping them in contact, was accomplished by the common and unpatentable device of substantially fastening them in a compact package, which would not be infringed by such a structure as that in use by the defendant, where the stiff, inflexible elements are bolted through hubs with an insulated bolt of metal.

These differences comprise substantially the issues of this case, and certain patents previously obtained have been cited and put in evidence by the defendant to indicate lack of invention with regard to the various points mentioned. It will be seen from an examination of these patents that Mr. Wightman was apparently the first person to make use of a pile or series of compact resistance sheets, for the specific purpose of a rheostat, to be employed in connection with electric motors, as distinguished from electric circuits in use for different purposes.

The defendant has introduced an article from the Telegraphic Journal and Electrical Review, printed in London in 1879, which describes a device of one Muirhead, tried first upon land telegraph lines, prior to 1875, in which year it was applied to the Marseilles-Bona Cable, and between that date and 1879 to the Transatlantic Cable, and in which a great number of sheets of tin foil, slotted to increase the length of the path, were piled together in such a quantity as to balance the resistance of the actual cable, and to form a noninductive resistance equal to the resistance of the cable itself. By this device the duplex system of telegraphy was made possible upon submarine cables, and the principle of an increased resistance, by causing a current to pass successively through a large number of elongated metallic paths or strips in electrical contact, was certainly devised. The Muirhead apparatus was again described in the Encyclopedia Britannica, published in New York by Charles Scribner's Sons, in the edition of 1888, and this device would seem to be an anticipation of the Wightman scheme of resistance, unless Wightman can claim invention and originality through the application of the same idea to accomplish a dif-

ferent purpose, even if the electrical phenomena be substantially the same.

It must be observed that the use of electricity as a motive power for railway cars was substantially undeveloped until some time after the use of the Muirhead condenser. Mr. Muirhead was constructing a device for a substantially different purpose, and it would seem that the application of the principle of an elongated path, by means of successive plates, the length of each plate being increased by parallel slots, extending nearly through the plate alternately from opposite sides, might have been suggested from the construction of a condenser in a similar manner; but the two ideas are not of such an identical nature, nor would the purpose and use of a condenser be sufficiently similar to the construction of a device to transform electrical energy into heat that it can be said that Wightman did not construct a resistance upon original lines, and did not make use of invention in the ideas set forth by his patent. It is true that rheostats were known and their need and use understood in the operation of electric cars, and it was for this very purpose that Mr. Wightman conducted his experiments. But the putting together of the idea of some form of resistance with the idea of an elongated insulated path, such as, perhaps, had already proven practicable in the construction of an electric condenser, equivalent in its resistance to a submarine cable, seems to the court to have sufficient elements of originality to justify patentability.

The defendant has referred to the Stockwell patent, No. 326,603, dated September 22, 1885, in which a number of resistance bars, such as carbon, were joined together by conductors to furnish a uniform resistance in connection with electric motors, lamps, and other appliances, and also to the Ries patent, No. 381,815, dated April 24, 1888, the Ries patent, No. 381,816, dated April 24, 1888, and the Simpson patent, No. 25,532, dated September 20, 1859, all relating to the use of electrical resistances, in the form of various wire coils, and for the furnishing of heat (the Ries patent of 1888, No. 381,816 being specifically for the heating of railway cars), and to the Van Depoele patent, No. 394,035, dated December 4, 1888, which made use of the principle of a series of artificial resistances in the form of wire coils (described to be an improvement in electric motors "especially in motors designed for the propulsion of vehicles"), and Mr. Van Depoele was plainly experimenting and inventing a device for accomplishing the ends attained by the rheostat, in the sense in which the term has been used herein.

But it would seem that the idea and purpose of a rheostat was not novel at the time of the Wightman patent, nor was the wire coil an experiment in the line of a compact pile, similar to the application of the Muirhead condenser to the purpose in view. These wire coils could no more be said to anticipate the invention of Wightman than the resistance of Mr. Bentley, patented August 13, 1889, under No. 409,135, in which Bentley, the complainant's expert in this case, described an artificial resistance made up of a series of plates in contact "and provided with a moving arm for cutting more or less of the

164 F.—28

plates out of circuit to vary the resistance at will." This Bentley invention has been referred to before in connection with Mr. Bentley's testimony, and the Wightman idea was substantially to substitute for each of Mr. Bentley's contact plates a compact series or pile, much more effective and convenient in form, as well as thereby reducing the number of resistance elements necessary. It would seem, therefore, that Wightman conceived an idea, which in its application to use for the purposes of a rheostat should be declared entitled to the merits of originality, practicability, and convenience, and properly given the protection of a patent at the time the letters patent were issued to him.

The next question to determine is whether the ideas of the Lundie patent, and the construction used by the defendant, are an infringement of Wightman. But before taking up this question it will probably save labor to consider for a moment the Short patent and the Case patent, even if the latter was anticipated by the use of the Sprague grid and the Crocker-Wheeler resistance. The general ideas of the Short patent and the points in which Mr. Short claimed an invention with relation to a resistance series of the Wightman type have been referred to. It is contended by the complainant, as has been mentioned, that the stringing of the resistance plates on the nonconducting pencils and the clamping of the plates, together with the pencils, between heads or end plates, as a means of getting rid of the trough used by Wightman, shows invention in conceiving an idea which should be looked at as a whole, and not viewed as a combination of (1) a plan to create flues in the plates by causing the perforations to register by the use of the nonconducting pencils, and (2) the fastening of the plates in a frame or box by means of bolts.

It would seem that Short's idea of providing flues through the plates, by causing the perforated plates to register by means of pencils of nonconducting material, was original. Further, the insertion of good conductors of heat was an application of the idea of radiation in a manner not apparently tried before. But all forms of resistance, as well as all structures used as rheostats, had been fastened in place and made available by means of some frame and bolt construction. The mere placing of plates in a box, and of attaching the box, whether open or closed (so far as the ends and sides were concerned) to the trolley car by means of bolts, or of bolting together the ends of the box, would seem to be an ordinary mechanical device, and not to contain such elements of originality as to be deemed worthy of being treated as an invention. The purpose of Short was to secure the radiation of heat by taking away the sides of the Wightman trough, and to allow passage of the air through the flues or ducts for the same purpose. The scheme of obtaining rigidity by passing the clamping bolts through the structure—that is, through each plate—and of insulating these bolts, is an independent idea, and a number of patents offered in evidence by the defense to show anticipation must be considered on this point.

The idea of radiation or open-air spaces between the elements was present in the Sprague grid, in the Crocker-Wheeler resistance sections, and in a number of patents, some of which have been already referred to, in which coils of wire attached at each end of the coil

form the elements.   Additional patents of this sort are those of E. W. Siemens, No. 324,176, August 11, 1885, the European Siemens-Halske patent, No. 2,251, November 10, 1899, and the McLaughlin patent, No. 432,205, July 15, 1890.   Subsequent to the issuance of the Short patent, also, a number of patents were obtained involving the development of the open-air style of resistance, such as the McNulta rheostat, No. 516,217, March 13, 1894, the Davis rheostat, No. 548,-867, October 29, 1895, and the Berresford patent, No. 648,481, May 1, 1900; while the Shelton patent, No. 530,727, December 11, 1894, embodied the idea of a separate resistance element, consisting of coils of wire bolted between nonconducting discs or plates of some material such as fireclay.

It is claimed by the defendant that these patents, including the use by Short, are but a development of the old coiled wire idea, and that the principle of air spaces between the elements of resistance is therefore not new in the Short patent.   In addition, it is claimed by the defendant that the use, by Lundie, by Berresford, and by Case, of rigid grids, with air spaces between the grids themselves, and the various convolutions or rods of the grids, is as well but a substitution of a different substance or form of grid, to overcome the disadvantages of flexible and movable wires, and that these last patents make use of the old air-space idea, which use was not prevented by anything contained in the Short patent.   With this contention of the defendant the court is inclined to agree, and, so far as patentable novelty is concerned, the Short patent must be limited to the manner of construction and to the idea of registering the flues or perforations, rather than to an invention covering and controlling any adaptation of the principle of open-air cooling of the resistance elements.

It does not seem to be contended that the Lundie patent, nor the device used by the defendant, interfere with Short's idea of nonconducting pencils, except as the bolts or clamps of the defendant's device might be called pencils of nonconducting material because insulated.   But insulation is an old idea.   Wherever bolts come in contact with another conducting element, insulation must necessarily be used, and the precise manner of application would seem to be a mechanical device rather than an invention.   Further, the insertion of bolts and clamps, if not purely mechanical, seems to have been anticipated, so far as the Short invention is concerned, in the construction of armatures and dynamos, as early as the Van Depoele patent, No. 394,035, December 4, 1888, the Belding armature, No. 415,697, November 26, 1889, the Belding armature, No. 433,391, July 29, 1890, as well as in the patents for electrical heaters above referred to; and this same principle has been made use of in the other patents between the date of the Short patent and the construction made use of by the defendant, which have been specified above.

The Davis patent, No. 548,867, dated October 29, 1895, shows a supporting rod passing through the center of the elements, with a thread at each end for purposes of clamping, and this patent specifies that:

"Where the central supporting rod is made of conducting material, any well-known means may be employed for insulating the resistance disks therefrom."

This idea of Davis would seem to be correct in treating the principle of insulation as well known and not patentable by Short at the time of securing his patent, and the defendant's device, therefore, would not seem to infringe claims 4 and 5 of the Short patent above referred to.

To return to the Wightman patent, the only remaining question is whether the device of the defendant as developed through the Berresford and Lundie patents, and in the Sprague and Crocker-Wheeler use of grids, is an infringement of the idea which in the Wightman patent has been considered by this court to be invention, namely, formation of a pile or series for the purposes of use as a rheostat, in which the large amount of resistance is obtained by the elongated path furnished by the many elements successively connected in the formation of the pile. The original idea of Mr. Bentley, of forming resistance by sending a current through iron plates, oxidized upon their lateral surfaces, is much similar to the idea in the Davis patent above referred to, and the substitution of cast iron or wrought iron for wrought-iron sheets was, as has been said, a development subsequent to the time of the Short patent. It would seem to the court that an examination of the condition of the art at the time of the Wightman patent, taking into account the use of wire prior to that time (wire necessarily being malleable iron and not cast iron), and a consideration of the details of the Wightman patent, leads to the irresistible conclusion that Mr. Wightman could not have had in mind the use of cast iron as one of the ideas which he was trying to protect by his patent.

It is true that Wightman merely specifies iron and conducting material, and cast iron would be included within the term "conducting material," if the scope of the claims and the condition of the art showed any idea of an intention to cover its use; but it would seem that Wightman was basing his claims to a patentable invention upon the form and use of many "sheets" in one pile, rather than upon the use of a conducting material or of any particular conducting material. The defendant's device would seem to the court to be, therefore, a rheostat in the form of a series or pile, not infringing upon the Wightman patent in any way, unless it be held that Wightman's invention was so broad as to cover the use of any material in any form wherein advantage is taken of an elongated path and a large number of elements. But this was present in the coiled wire resistance boxes, and in the electric heating apparatus of Simpson and Ries, above referred to, as well as in the Stockwell switch, No. 326,603, September 22, 1885, and the Van Depoele motor, No. 394,035, December 4, 1888, and it must be held that Wightman's invention, while making use of similar principles, did not prevent the adaptation of those principles in a different manner, in the form eventually adopted by Berresford, Lundie, and the defendant corporation. The structures or devices which the complainant has placed upon the market, showing a closely clamped and packed rheostat, of flat resistance strips, and the so-called ribbon rheostat of the Westinghouse Company, also made use of by one of the complainants, show the development of the Wight-

man idea, and the use of the same principle of an elongated path and of successive resistances, but in other respects only emphasize the difference between the Wightman invention and the ideas of Berresford, Lundie, and the defendant.

Subsequent to the original argument of the case further testimony was taken with reference to an alleged use by Mr. Sprague, in Richmond, Va., in the years 1887 and 1888, and at Jamaica, L. I., and other places, in the year 1888, and a blue-print marked "1–103," of the resistance used by Mr. Sprague, has been offered in evidence. The use of this resistance for the purpose of a rheostat depends upon the testimony of one Patrick O'Shaughnessy, and the accuracy of his recollection is called in question by a number of affidavits submitted on behalf of the complainant. The testimony of Mr. O'Shaughnessy is hardly definite and persuasive enough to add anything to the defendant's case, and therefore the use by Sprague of any device such as is set forth in the blue-print 1–103 has not been taken into consideration in this matter.

But, without this, it is considered that the contention of the defendant, so far as infringement is concerned, has been supported, and in each case a decree may be entered dismissing the bill.